Case number 25-5578, United States of America v. Quantrese Brazzell. Argument is not to exceed 15 minutes per side. Ms. Salinas, you may proceed. Good afternoon. May it please the Court. I'm Melissa Salinas, and I thank the Court for allowing me to supervise a student attorney in this case, and I would like to introduce Daryush Adut. Thank you. Very well. Thank you. Good afternoon, Your Honors. Good afternoon. May it please the Court. My name is Daryush Adut, and I represent the appellant, Mr. Quantrese Brazzell. I'd like to reserve three minutes for rebuttal, please. Very well. With the Court's permission, I'd like to focus on the Fourth Amendment issues of this case, and because the District Court avoided ruling on the propriety of the initial search of the vehicle by Officer Holloway, I'll focus mainly on the inventory search, the ground on which the District Court denied suppression. Do we need to call it an inventory search? Could it just be a good old-fashioned automobile search? Are you referring to— The Campo search. I tend to think of that as just an automobile search. And at that point, we already had the fact she had smelled that there was alcohol in the breath. He had failed the field sobriety test. They had arrested him, erratic behavior, all that. Are you contending they didn't have probable cause to arrest him before she conducted her search? No, Your Honor, that's not what we're— So my question is, why isn't it just an automobile search? And I think you can just search all the automobile if you have probable cause for arresting someone. Understood, Your Honor. I think it's important to differentiate the different theoretical bases on which the search would have been conducted. Do officers have to do that? They have to stand around and say, oh, this is an inventory search we're going to conduct now, or this is an automobile search. Can't they just do a search, and it's up to us as judges to look at it and say what it is? So this would be—assuming that the first search by Officer Holloway was invalid and unconstitutional, this would be an application of inevitable discovery. And in that circumstance, we don't look at— Well, it wouldn't be for the gun, would it? For Officer Shelton's search? So the gun was discovered—so I think it will be helpful to detail the timeline here. First, at like 1148, Officer Holloway and Officer Campos approached Mr. Brazel. Within two minutes, Officer Campos searched his vehicle. And then roughly 20 minutes later, you have a purported inventory search by Officer Shelton. But the gun was only discovered in the Campos search, right? It was discovered by Officer Shelton in the second search. Oh, the Shelton, after Campos. So Campos— So I'll give you—the timeline is 1150, Officer Holloway, initial search of the center console. Then at 1213, you have Officer Shelton's search of the trunk. OK. I thought Campos came second and then Shelton— No. So there is a little bit of confusion in the record about this because the officers actually testified that the inventory search here was Officer Shelton's search. But the ground on which the magistrate in the district court ruled was Officer Campos' third search, which occurred at 1220. So both the gun and the drugs had been discovered before Campos— Prior to Campos' inventory search. That's correct. And I was mistaken. So if you still have questions about whether that would have been inevitably discovered, I'm happy to discuss that. OK. OK. Got it. So you're addressing the very first search within minutes of pulling him over, right? So I was addressing the ground on which the district court upheld suppression, which is that final search by Officer Campos, which— But we could affirm based upon the automobile search. Correct, Your Honor. Even though the district court didn't rely on that. That's correct. And I'm happy to discuss probable cause. OK. Well, let's talk about that then. I was trying to use Campos as the search, but I guess we have to use Holloway as the search, at least for the drugs. That's correct, Your Honor. So let's talk about that. Why isn't there enough here for probable cause to search the vehicle? So I think it's helpful to just read from what the district court found regarding Officer Holloway's testimony at the suppression hearing. All that—Officer Holloway testified in relevant part to the following. The defendant did not seem too coherent. He looked confused, and Officer Holloway believed something was wrong, but didn't know whether he was intoxicated or having a medical crisis. I think, you know, at first bat, common sense can just confirm that looking confused in a vehicle is not probable cause to believe that a defendant has taken narcotics or that the further inferential step that narcotics will be found in the vehicle. We can look to case law to confirm this as well. In United States against Morgan, there was a similar factual situation. An officer encountered an individual who had been passed out at the wheel for over 10 minutes with their head tilted back. Based on the officer's experience, he believed the individual was intoxicated or overdosed, and he approached the car, opened the car door. And this court held that that initial seizure was invalid under the Fourth Amendment, applying the community caretaking exception. I think inherent in that finding is that the circumstances there could not furnish probable cause. And I think you have the same here. You have an individual who's not asleep in their car, but appearing confused. You know, the officer suspects something is wrong, but there's nothing to suggest the presence of narcotics or that Mr. Brazel has taken narcotics. So if it was inappropriate for the officers, you know, right off the bat then without, you know, more indication that there would be narcotics in the console, right? And so it was improper for them to go in immediately and just look at the console. At some point, I think you agree that your client failed sobriety tests and is arrested and arrest your not contesting. And at that point, they're going to tow the car, right? I mean, you have a car that's like monopolizing the middle of an intersection or something, right? They're going to make sure there's, you know, not stuff in it or whatever and tow it away, right? Why, you know, why wouldn't they have found the drugs in the console anyways just later? Why does an inevitable discovery save the search here? Just to clarify, Your Honor, is this inevitable discovery through the inventory exception? Through the inventory exception. Okay, so in United States against Ford, with specific reference to inevitable discovery and the inventory exception being applied via inevitable discovery, this court said the government can only satisfy its burden by showing routine procedures would have resulted in the discovery of disputed evidence. But where the police were not, in fact, following routine procedures in the particular case, the government's evidence— So I think it'll be helpful to actually talk about the policy. How about just answering that question?  It wouldn't be routine for the officers to look in the center console when doing an inventory search? They don't look in the console, make sure there's, you know, not a gun in there? So the routine would be following the procedure. And I'm attempting to respond to your question here. I'm not trying to dodge the question. But an inventory search is valid only to the extent officers follow routine procedures. And in Alexander, this court held— So you're telling me it could have been routine, but they did something else that wasn't routine. That's correct, Your Honor. But the actual part that you're contesting in terms of looking in the console could, you know, would be part of their routine. They just messed up their routine otherwise. If they had conducted the inventory search correctly and gotten to that point, then it would have been routine. I think it's—Alexander makes a helpful point on this. There's standardized procedures as to when an inventory search can be conducted and as to how an inventory search can be conducted. And with reference to the center console, that would be part of the how. And I think, like, we don't dispute that if the officers had lawfully followed the procedure for when they can conduct an inventory search, then that would have been— Let me ask you, wouldn't the inevitable discovery doctrine assume that if you had conducted a proper inventory search, you would have discovered it? It doesn't really look at whether or not you actually conducted an inventory search or how it was conducted. So this is the point I was making with Ford. They say the government's evidence about what they would have done in the case of an inventory search must bow to contrary evidence about what they actually did. So you say that case does say we have to look at how they actually— Yes, that's correct, Your Honor. So what about the case where the government makes an argument that it would be inevitably discovered through inventory search, but they never did an inventory search? Well, I think that— You say Ford in that case would say you still couldn't use inevitable discovery? No, that's not what Ford would say. Ford would say we can credit the government's evidence about what they would have done, but here we don't have to even engage in that inquiry because we have the inventory search that the officers actually conducted, and that didn't comply with the standardized procedures for when an inventory search can be conducted. So what was wrong about when? You said the how is okay. What was wrong with the when? So the tow-in policy authorizes officers to impound a vehicle if only two requirements are met. One is that a supervisor is contacted prior to requesting a tow truck, and the second requirement is that a defendant is informed of their alternatives to having their vehicle towed, and the defendant needs to be informed of those alternatives, quote, before the decision to tow is made. Here it's undisputed that no officer at any point in time informed Mr. Brazel of his— Was there a plausible alternative here of the options? I mean, I understood your brief as saying, like, you know, if the car is, you know, parked on the side of the road in the same place or something, it could maybe just be left, right? We already established that that's not what's going on, right? Your client, the defendant, right? He can't drive the car to the side of the road himself, right? And there's no third party at the scene that can drive it. So what option do they need to let him know about? So I think with respect to the third party at the scene, two things are worth note. One is that Mr. Brazel had informed the officers that he had called a tow truck, and the second thing is it's important to keep in mind that this is— So we've got to wait the whole time with this car in the middle of the intersection for the tow truck to come? No, I don't think we have to wait. I think all that the officers have to do is inform Mr. Brazel of his options, and if Mr. Brazel is able to exercise them, that's great. But the inventory exception asks only whether officers adhered to the procedures, not whether it's likely adhering to the procedures would have resulted in— Am I correct that they would do an inventory under the procedure regardless of whether the city towed it or a private company towed it? There would still be an inventory search done by the city in either scenario. By the city? I don't think that's correct, Your Honor. I don't think that the city searches vehicles pursuant to a private tow. Really? They wouldn't protect themselves against charges that they had stolen something that maybe could be stolen at the private company? I find that hard to believe. They wouldn't do an inventory search even in that scenario. In that scenario, that assumes that the police are taking custody of the vehicle. Here, the policy operates— No, just to protect themselves, they were on the scene, and they want to make sure when the private company takes it that they can document what was in the vehicle at that point. It seems like they would have that policy. I thought it was in the policy. You don't think it is in the policy? No, I don't believe that the officers— because in that circumstance, it would be as if a third party had taken custody of the vehicle. Right, just to protect the vehicle. The reason police need to protect themselves from claims of theft is if property of a defendant is in the custody of police, so when the police return it, a defendant can't turn around and say, hey, I had $500 in the vehicle that's missing. That sort of policy— You don't think they would have done it— under the city policy, they would not do an inventory search if a private company towed the vehicle away. That's correct, because the policy operates pursuant to a tow by the Memphis Police Department. It doesn't speak to what happens when a third party takes custody of the vehicle. Just briefly, Your Honors, I see my time is up. Go ahead, please. All I want to say is that the severity of the violation of the policy is something that should properly be considered in the context of the exclusionary rule. I think it's undisputed that the officers didn't comply with the policy here, but I'm happy to discuss that point more on rebuttal. Thanks, Your Honors. Okay, thank you. Good afternoon, Your Honors. My name is Greg Allen, and I represent the United States of America via the Western District of Tennessee U.S. Attorney's Office. We are asking this Court to affirm the District Court's denial of Mr. Brazel's motion to suppress for two primary reasons, which Your Honors already identified. Those are the automobile exception and then inevitable discovery through a lawful inventory search. Alternatively, if we have time, there's the basis of is exclusion warranted? Is this the type of conduct you want to deter? For the second issue that's brought up regarding jail calls, we're asking this Court to affirm the District Court's discretion in introducing those. Turning first to the first issue, if I could address Your Honors' point, record entry 40-1, page ID 128 states that regardless of whether it's a private company or a city of Memphis tow, that they are to inventory the vehicles. Okay, that's what I thought. Yes, Your Honor. Next, turning to the first issue, if I could start with the inevitable discovery, because we believe it's dispositive on this issue. Here, the routine procedures, the Ford case, which Your Honor mentioned, is essentially what the District Court held. They basically said no matter what happened prior to that inventory search, prior to the Officer Campo's inventory search, which actually occurred at 2-18, after contacting a supervisor, after contacting his tow truck, that's when she went to the vehicle with the Memphis Police, tow slip, inventoried items in the vehicle. So we believe that it would have been found through these routine procedures under what could have happened or actually what happened in this case, Your Honor. But the listing that we have in the record that she did, I think only lists the inculpatory findings of evidence. It doesn't list the routine things, does it? It does, Your Honor, respectfully, and that's noted in the District Court's order. They actually inventoried things that were not inculpatory. But what is he basing that on what he saw in the video cam or what? Correct, Your Honor. So the tow slip was not introduced in evidence. What happened to the tow slip? The government's submission was that it was lost. We never received it. We couldn't introduce it in evidence. We didn't have it. But I think just having the piece of paper is not dispositive. You see in the video, the body cam, those are required by these officers. They're warned. You have video evidence that this was actually done. So I don't think just because – Is it part of the proper procedure for an inventory search to keep the inventory slip? Is it part of the inventory procedure to keep it? Yes, I would – So is it based on the fact that we don't have the inventory slip here today, just like itself, proof that there wasn't an inventory search that was according to policy? Respectfully, no, Your Honor. I would submit that you do have evidence of it that's in the record. That's the body cam video. But you just told me that was part of the procedure to keep the slip. It is, but the touchstone of the Fourth Amendment is – And they didn't keep the slip. Well, I don't think we know what happened to the slip. Well, you don't have it now, so it was not kept. That's correct. It's not filed with the precinct that we know of. So you have to agree that you didn't follow the procedures fully. Correct. I would say that. Okay, so how then do you square with Ford? So I think it's what happened in this case is what actually occurred, and then the touchstone of the Fourth Amendment, which is reasonableness. Here they actually did fill out the toast slip after contacting a supervisor. Isn't there a problem with that? Because the issue here is whether they in fact complied with the governing policy, right? That is correct. We don't get to this other question until we can say that they had a right to tow and a right to inventory, and they did it in compliance with Section 8 of the, what, 11-page tow-in policy, which is really clear about what has to be done. I'm struggling with, first of all, we've got all of the officers there disagreeing about if an inventory search was undertaken and who undertook it. And they take a position, you all take a position, that's different from the position that the district court took. And then we have to make that comport with the written language of the policy itself. How is it I'm struggling with how it's an inventory search in accordance with this policy in the context of there being a complete dispute among the officers about who, if anyone, actually did an inventory. Correct, Your Honor. And I will admit that this is a little messy on the record.  It is correct, Your Honor. So Section 8 of the policy discusses inventory of the vehicle. And it goes through the policies and actually references back to the section where there's specifically one for DUI. And under that section it gives the procedures that these officers substantially and reasonably complied with. Well, let's, I think the DUI is a bit of a question too because this was reported to the police as a community caretaking problem, right? That's correct. And when Holloway went to the windows on either side and Holloway, I'm thinking we're starting at 1139 with the call, Compos and Holloway are on the scene for one minute before they tell him to get out of the car, right? But they don't arrest him. This is not incident to arrest. Correct. We are not saying this is a search incident to arrest. So we have Holloway opening the closed center console within, at 1151, right? That's correct. So are you conceding there's a problem with that search? No, Your Honor. We would say, and that goes back to Judge Bush's automobile exception, because you look at the totality of the circumstances. Here, these officers on the body cam state that they saw this individual earlier. This is a vehicle that is stopped at a red light, blocking traffic. They go around it to another call. They receive the 911 call back. As they pull up, there's actually a concerned citizen said, he's been here for a long time. That's an important fact that I think we need to. What question and where in this record is there any question from the police officer about community care taking and about his physical well-being? Correct, Your Honor. I would submit you in turn to, I believe it's the exhibit from the motion to suppress hearing, and I can get the exact number as I'm answering your question. But you nailed it. The first thing that the officers say is when they go to his vehicle, Officer Holloway on the passenger side, Officer Campos on the driver's side, are you okay? That's the very first thing out of their mouths. So they do check on him. Followed by what? Followed by?   To exit the car, right? Not yet. Turn off the car, put it in park. Why are you rolling down the windows? Why did you crank the car back up? Then it's step out of the car. Those commands do occur, Your Honor. But it's also we need to make sure you're okay. And that will be in Officer Holloway's body cam, and that's a shorter body cam. And then if that's what they're worried about, what you have is Officer Holloway, after he gets out of the car, Officer Holloway gets in and starts a search. That's correct, Your Honor. And I'll go back to kind of the factors that I was getting to, is he had been there for hours. Before the search occurs, the defendant's own statement, I've been here since 5 or 6, my vehicle's messed up. So you have been there for hours, stalled or at least immobile at a traffic light. That's a huge factor. The confusion, the disoriented, the bloodshot eyes, Officer Campos does, in fact, later testify that she smelled alcohol when he got out. But she didn't tell Officer Holloway. Correct. He did not know that. I concede that point. He did not. And, in fact, he mentioned that. He said, well, you should have told me. So what case supports that? My look at these cases indicates that you can assume that there might be information about a crime because that's what gives him the authority to search. Correct. You can assume that if you have some additional identifying evidence. And the ones that I see where you've got somebody who's bloodshot, maybe slurring a little, all of those that I'm finding in our jurisdiction then include an open container or some other evidence, plain view drugs, plain view alcohol. But that was not the case here, was it? Well, and I wish I would have highlighted this in my brief more, Your Honor, but there was a cup, a clear plastic cup, in the driver's floorboard. It's readily apparent. You can see it in Officer Holloway's body cam when he searches the vehicle. And, in fact, Officer Campos references that later. But I will submit to you that you didn't know that because I didn't highlight it in my brief. So I should have done that. In preparing for this, I noticed that. Is that what they testify about? No, no. So it wouldn't have been part of the district courts? It wouldn't have factored. Correct, Your Honor. But I would submit you still have it without that. But that is pretty powerful evidence. The court had been idling for hours. He was confused, had difficulty following the commands. He's struggling to put the car in park. The windows are teeter-tottering or seesawing, if you will. And how? I understand that. So your position is that they are allowed to assume then that he is engaged in the crime of DUI. Is that your basis? That is correct. So at that time— What's your best case for that? I believe we cited Anderson. But I'm not sure that's going to be the best case for that, Your Honor. I know Morgan has come up a couple of times, but we have distinguished Morgan. So I apologize. I don't have a direct answer on what's the best case for you can search the vehicle based on reasonable suspicion. When she takes him out, what she tells him is that she didn't arrest him, but he's being detained for officer's safety. Correct. That is undisputed. That's what she said. But then you have—she's not the person that conducted the search. I would submit to you what— Yeah, she's the person who conducted part of the later search. The later search. But the initial one, when I think Your Honor is asking about the problematic, is Holloway. So Officer Campos is a newer officer. Officer Holloway is our field training officer. What I would submit to you happened in this case and why there's probable cause under the automobile exception is those factors, the bloodshot eyes, the failing to follow the instructions, the windows going up and down. At that point, imagine if you're prosecuting someone with that. There was a day way before we had all this technology where you can convict someone of DUI just based on these officers' testimony. Well, I guess I understand. I think the thing that is concerning is that this was a community caretaking access-to-the-car case, and I don't hear any discussion in your argument or in the information or in the videos and the tapes that are about, do you have an illness? Do you have diabetes? Any other questions about community caretaking, just an immediate beginning of the search of the vehicle? And I would go back to the first question they asked was, are you okay, and step out. We need to make sure you're okay. But at that point, I would submit, based on these officers' training and these facts, the car being there forever, the hours, the windows going up and down, he's having trouble putting it apart. In that short amount of time, they were able to determine this isn't a community caretaking exception anymore. This guy has been asleep or passed out at the wheel. Because you have to remember, they walked up, they knocked on the vehicle, and that's the distinction from Morgan. Morgan, they went ahead and pulled the car door open. So they knocked not once but twice, and then that's when the windows started coming up and down. And there was reference to, well, didn't they grab the handle and pull it out? If you watch the body cam, I would submit to you that Officer Campos only reached to pull the car out after her partner said, step out of the car. So I think that's an important distinction as well. But we submit to you, based on all these facts, that they did have probable cause that this vehicle would have evidence of a DUI, based on those factors. And then continuing, where did he search? In the vehicle. I mean, that's obviously you need a vehicle for a DUI. And in the area that they searched, it's not like he went behind a door panel or underneath a carpet and other cases. He went in a closed compartment. He went into the center console, which is in the immediate area of the driver, the only occupant. And then after that, once you find the pills, and this is kind of hinted at in footnote four of our brief, is they find pills, they have fentanyl pills. This is 500 pills. That would give them probable cause to further the search of the whole vehicle, which is when Officer Shelton's search occurred, which is 12-18 approximately, 12-08. And I'm down to one last minute. So at that point, they would have ---- Why don't you address in the last minute how the officers complied with the strict requirements of the tow-in policy? Yes, Your Honor. Section 8. Yes, Your Honor. So first, they didn't have to inform him of unreasonable possibilities. It's undisputed that there was not a third party on the scene. He's the only person in the vehicle. At this time, when they're going to do the inventory search, he's drunk. He's failed field sobriety tests. He later fails the blood draw. It's .085, which hours later, it's assuming that the blood alcohol went down, so it's higher at the time. They didn't need to inform him of someone else can move your car. He couldn't do it himself, and it's not lawfully parked. So at this time, they're constantly flagging traffic around. So there was no noncompliance with the policy for things that could never have happened. After that, they contacted the supervisor. They actually did complete the tow slip, and they inventory things that weren't necessarily evidentiary value, cigarettes, clothes, bags, and my time's up. I will continue to answer the question the best I can. Sorry, I went a little fast at the end. No, that's fine. We gave a little extra time for the other side, too. Does anyone else have any more questions? Did that answer your question, Your Honor? And then I will stand for any questions. I know you are tough, but on the jail call issues, any questions regarding those. If not, I'd rely on our brief. Okay. Thank you, Counsel. Thank you, Your Honors. Let me ask you a quick question. I know I'm throwing you off today. I'm sorry about that. And I'm thinking about Campos. I have another hypothetical for you. Suppose Campos had done the initial search instead of Holloway. Do you think she would have had sufficient knowledge to be able to do the search, given that she had smelled that he had alcohol in his breath? I do think it would be a much closer case, Your Honor. And there are cases out of the circuit saying the smell of alcohol or marijuana is a factor in establishing probable cause. But because she smelled alcohol and Officer Holloway did not, I think it's very different for that reason. Yeah, I guess I'm thinking about the exclusionary rule itself, that it's designed to punish or deter officers from bad behavior. And it seems kind of odd in this situation. If we determine that Holloway engaged in bad behavior, essentially we're going to be punishing her too, even though she had the requisite knowledge to do the search. And it's just kind of a I don't know why one did the search and the other one didn't. So in this circumstance, it's like a quasi-inevitable discovery here, saying, well, Officer Campos smelled alcohol. Maybe she could have searched the vehicle. I would instruct your – or I would, you know, commend the Ford case and Keslay case saying that in application of the inevitable discovery doctrine, we keep speculation at a minimum. It's the government's burden to establish that they would have inevitably discovered the evidence, and there's nothing in the record to suggest that officers, you know, when there's an arrest for probable cause for a DUI, that they search the vehicle, you know, in the vehicle. So in that circumstance, we concede that if there was probable cause to search the vehicle, they could have searched the vehicle, but we don't know whether they would have, and it's not our place to speculate. A couple of things I – Address the inventory. It seems to be quite a mess of how it was done and the different people. One trunk, one intro console, one 30 seconds in the back seat, 10 seconds in the front seat. I mean, it's a very short one. But does that rise to the level of violating the written policy? Your Honor, I think it does because there's only two requirements in order to tow a vehicle, and one is to inform the defendant of their alternatives. And my friend on the other side says – But is that necessary here given that he's drunk? I mean, you have an incompetent person. Do you really have to comply with notification at that point? I mean, normally the law says you don't. So I think, like, in the circumstance of the inventory search exception, it's important that officers do adhere to standardized procedures. This policy exists to allow defendants the opportunity to have someone else take custody of their vehicle, and it affirmatively limits the officer's discretion in doing so. And without holding officers to their word to the policy, there's no individualized suspicion requirement for an inventory search. So you're kind of in that world that the doctrine is trying to ward off a level of uncatalyzed discretion. Can I ask you about telling him that he can have a third party move the car? If they told him you can have a third party move the car, do they then need to – who knows when the tow truck is coming that he already called? How long do they have to wait? Doesn't it have to be someone at the scene? The policy does say a third party at the scene. Okay, so doesn't it seem like to tell him he can do this when it can't happen and could actually cause problems or confusion? You're telling him he can have somebody else move it, but there's nobody there. How does that make sense? It seems, quite frankly, counterproductive. Well, a couple of things on this, Your Honor. I don't think it's our position at this stage in the litigation to rule on the prudence of the policy. This is what the policy requires, so I believe it's what's required by the Fourth Amendment because of how the doctrine works. But more to the point is that we can't really know ex post whether someone could have taken custody of the vehicle because Mr. Brazel was never afforded the opportunity. What's your other best policy violation, besides for the lack of informing about the options? You said there were two, right? Well, there are two requirements. Who else was the policy violated? What's the next most significant violation of the policy? Well, there was no tow ticket ever entered into evidence, and this was part of the policy. But we don't require you actually have to have a written inventory, do we? No, we don't. We require that officers adhere to the policy, and the policy can be written or it can be testified to, but here we don't need to engage in the question because there is a written policy that the officers didn't comply with. Your Honors, if I may just briefly conclude, I think what's looming in the background here is that we don't know whether following the policy would have made a difference or the relative severity of the violation of the policy, but I think it's undisputable that the policy here was violated, and that's something properly to be weighed in the context of the exclusionary rule. And once we're in the land of the exclusionary rule, it's not just Officer Campos' search. It's Officer Holloway's initial search within two minutes when they were called for a medical emergency. It's Officer Shelton's search that complied with no requirements of the inventory policy. And then you have this third time's charm indication of the inventory exception applied via inevitable discovery, and we're still not at a point where we have a valid search of the vehicle. And for those reasons, I think this Court should order suppression of the evidence. Thank you very much. Thank you. And thank you for your argument. We appreciate the university and the clinic representing the defendant in this case, and thank you for the government's argument as well. So we'll take the matter under submission.